[No. F048970. Fifth Dist. July 17, 2007.]

VINCENT EDWARD BROTHERS, Plaintiff and Appellant, v.
SHANN TERESE KERN, Defendant and Respondent;
KERN COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES,
Intervener and Respondent.

### COUNSEL

Kevin G. Little for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Bill Lockyer, Attorney General, Thomas R. Yanger, Assistant Attorney General, Paul Reynaga and Sharon Quinn, Deputy Attorneys General, for Intervener and Respondent.

### OPINION

**WISEMAN, Acting P. J.**—Vincent Edward Brothers, plaintiff and appellant in this case, is also the defendant in a pending capital murder prosecution. The jury has found him guilty and has recommended that he receive the death penalty. Sentencing has not yet taken place. At the time of the killings, Brothers was subject to a child support order. After he was taken into custody on the murder charges, Brothers liquidated his assets and used the proceeds to hire an attorney, who took most of the money as a retainer and placed it in his client trust account. The court in this case then modified the child support order, basing the new monthly amount on the interest that could have been earned on the proceeds of the liquidated assets rather than on Brothers's income before his arrest. It directed that the current amount due, as modified,

be paid to the mother from the client trust account. It also required Brothers to use funds from the account to post a security deposit for future support payments, to be held by the Kern County Department of Child Support Services and disbursed monthly. The deposit was to cover all payments that would become due during the two years remaining before the child reached majority.

The total support amount Brothers was ordered to pay out of the client trust account funds was $17,399.95. The liquidated assets amounted to approximately $150,000.

We reject Brothers's contentions on appeal that the trial court applied the Family Code incorrectly when it modified the support order and that no support or a smaller amount of support should have been ordered. We also reject his argument that, even if the modification was consistent with the Family Code, it violated Brothers's constitutional right to criminal defense counsel of his choice by diminishing the amount he had available to pay his retained counsel. The United States Constitution does not insulate a criminal defendant from third party claims just because the satisfaction of those claims reduces the defendant's ability to afford retained counsel. We affirm the judgment.

## *FACTUAL AND PROCEDURAL HISTORIES*

The present lawsuit began in 1993 when Brothers sued Shann Terese Kern to establish his paternity of their daughter, who was born in 1988. He obtained a judgment of paternity, was awarded joint custody and visitation rights, and was ordered to pay support in the amount of $350 per month. In 1997 the support obligation was increased to $500 per month and in 2003 to $771 per month. Brothers and Kern were not on amicable terms and were subject to restraining orders barring each from contacting the other except for purposes of visitation.

Brothers was married to Joanie Harper. The couple had three young children. In July 2003, Harper, her mother, and the three children (ages four years, 23 months, and six weeks) were found dead. Brothers was arrested on April 30, 2004, and charged with five counts of first degree murder. He has remained in custody since his arrest.

Brothers was current in his support payments when he was arrested, after which time the payments stopped. The Kern County Department of Child Support Services (the department) filed a motion on October 7, 2004, to modify the support order in light of Brothers's incarceration. The court placed the support order in a "reserved status" pending production of documents disclosing the status of Brothers's assets.

Before the documents were produced, Kevin Little, whom Brothers had retained for his criminal defense, attempted to persuade the court that no assets were available. In a letter to the court, Little claimed that, because the criminal court had found Brothers indigent, "there is little point in further inquiring as to [his] financial status." In a letter to the department's counsel, Little asserted that because of the indigency determination, it had been "judicially established that Mr. Brothers has no means to pay the amounts requested in this proceeding."

When the documents were produced, they revealed that Brothers had sold his house shortly after his arrest. A title company sent a $128,508.19 check payable to Brothers, representing the proceeds of the sale, to the law firm of Floyd & Horrigan on May 4 or 5, 2004. The check was immediately delivered to Little, whom Brothers had retained some time earlier. Pursuant to the retainer agreement, Little placed $100,000 in his client trust account as a retainer. The appellate record does not show what happened to the remaining $28,508.19. Little also placed a lien on Brothers's retirement account, which was worth between $80,000 and $90,000. On February 3, 2005 (the day before the first hearing on the request for modification of the support order), $48,823.14 remained in Little's client trust account for Brothers.

After these facts emerged, the department argued that the court should reinstate the support obligation in the previously established amount of $771 per month. It further contended that the court should order immediate disbursement of this amount going back to Brothers's last payment and going forward to the date when the daughter would reach majority. The portion covering the future payments would be deposited with the department as security. The payment, which would total $27,746.88, would come from Little's client trust account. Assets from the retirement account would not be available for many years.

Through Little, Brothers argued that the support obligation was zero because, being incarcerated, he had no earnings. The imposition of a support obligation based on assets, he claimed, would be improper under the Family Code. Even if an obligation could be imposed, it should not include a deposit to secure future payments. Further, Brothers contended, all the assets had already been spent. The cash retainer and the lien on the retirement account constituted a "true retainer" and therefore were "the property of the attorney, not the client." Finally, according to Brothers, "[t]he deprivation of funds legally, reasonably and in good faith paid to his attorney for his representation in a case where his life is at stake would be in blatant violation of his constitutional right to retain counsel of his own choice with funds that were completely his at the time."

The trial court rejected Brothers's arguments. It did not, however, reimpose the support obligation at the previous level. Instead, it established a new figure based on interest Brothers could reasonably have earned—5 per-cent—on the assets he liquidated or could have liquidated after his arrest. Taking into account the house, a car, bank accounts, and a refrigerator (but not the retirement account), the court found that $155,000 in assets were available as a "conservative estimate." Of this amount, $150,000 was avail-able after payment of debts and expenses accrued before Brothers's incarcera-tion. The interest on this amount would be $625 per month.

Applying the statutory child support guideline to this amount of income, the court found that the normal support payment would be $171 per month. Considering the best interest of the child, it then exercised its discretion to depart from the guideline figure and set the support obligation at $600 per month. The court recited five reasons for this decision: (1) having no visitation, Brothers did not support the child in any way other than making support payments; (2) because there was no visitation, the child would not suffer any detriment from an increase in the amount of Brothers's resources that went to support payments; (3) Brothers's standard of living would not be affected by the increase because he was incarcerated; (4) the guideline figure was too small to maintain the child's current standard of living; and (5) the $600 figure would not exceed the imputed income and would leave a small amount of funds for "reasonable personal expenses" Brothers might incur while incarcerated.

Using this monthly figure, the court ordered Brothers to pay a lump sum of $21,750. This amount consisted of (1) arrears based on the original support order for the five-month period between Brothers's arrest and placement of the support order into reserved status; plus (2) all amounts payable based on the new figure until the child should reach majority, starting from the reserved-status date.

In requiring advance payment for future months, the court relied on Family Code section 4012. That section allows the court to require a security deposit for future payments upon a showing of good cause. The good cause in this case was that Brothers had attempted to commit all his resources to his legal defense, leaving nothing for child support. The court did not believe that Brothers acted frivolously or unreasonably in disposing of his assets to pay his lawyer, but ruled nonetheless that, "when a parent has demonstrated intent to dispose of [his] assets without making reasonable provisions for the support of the minor, the Court may set aside from those assets funds sufficient to pay that support." The court deliberately set the amount of the support obligation low enough to leave Brothers with "sufficient available

assets to meet the immediate obligations and expenses associated with [Little's retainer agreement] and the pre-public funded costs of his legal expenses."

The court rejected the argument that Brothers had already spent the money in the client trust account. It ruled that the funds remaining in the account were unearned and that unearned attorney's fees held in a client trust account remain the property of the client. Among other things, it stated that if the funds had become the attorney's property, their continued presence in the client trust account would constitute improper commingling of attorney and client funds.

Responding to Brothers's argument that a child support order would violate his right to counsel of his choice, the court ruled that this right entitles a criminal defendant only to choose counsel he can afford. The enforcement of a financial obligation to a third party reduces what he can afford.

The court made this order on June 27, 2005. On August 19, 2005, the court reduced the lump-sum amount to $17,399.95. This reflected a credit for a tax refund owed to Brothers and intercepted by the department.

## *DISCUSSION*

On appeal, Brothers makes two arguments: (1) the modified support order erroneously applied the Family Code in several respects; and (2) the imposition of a support obligation, under the circumstances, violated his Sixth Amendment right to criminal defense counsel of his choice. He does not renew his argument that the funds in the client trust account had become the property of Little. We consider his two arguments in turn.

I. *Application of the Family Code*

*Standard of review*

We review an order granting or denying a request for modification of a child support order for abuse of discretion. (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 947 [126 Cal.Rptr. 805, 544 P.2d 941]; *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371 [40 Cal.Rptr.3d 910].) The trial court's exercise of discretion must be "informed and considered" (*In re Marriage of Muldrow* (1976) 61 Cal.App.3d 327, 332 [132 Cal.Rptr. 48]; see *In re Marriage of Pearlstein, supra*, 137 Cal.App.4th at p. 1371), and the court may not "ignore or contravene the purposes of the law" (*County of Stanislaus v. Gibbs* (1997) 59 Cal.App.4th 1417, 1425 [69 Cal.Rptr.2d 819]). Adherence to the statutory guideline in determining the amount of child

support is mandatory· and the court has discretion to depart from it only as permitted by statute. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 284 [111 Cal.Rptr.2d 755].) Where the decision includes an interpretation of the statutory definition of income, this interpretation is reviewed de novo. (*In re Marriage of Pearlstein, supra*, 137 Cal.App.4th at pp. 1371–1372.) To the extent the appellant challenges the trial court's factual findings, we review the findings for substantial evidence, considering the evidence in the light most favorable to the party who prevailed in the trial court. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151 [62 Cal.Rptr.2d 466].)

Brothers challenges three aspects of the court's order. First, he contends that his actual income was zero and that the court should not have imputed any income on the basis of the interest-earning potential of his assets. Second, he argues that the court was wrong to depart from the guideline figure. Finally, he asserts that the requirement to post security for all the future payments was incorrect. We will discuss these positions separately.

### A. Imputed interest income

Under the guideline set forth in the Family Code, child support obligations are calculated using an algebraic formula in which the parents' net disposable income is a major factor. (Fam. Code, § 4055.)[1] Net disposable income is equal to gross income less certain deductions. (§ 4059.) Gross income "means income from whatever source derived" (§ 4058, subd. (a)), including "interest" (§ 4058, subd. (a)(1)). This establishes that interest income is a proper basis for calculating child support.

The next question is whether it was proper to impute interest income that reasonably could have been earned, but was not actually earned. Section 4058, subdivision (b), states that "[t]he court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." The statute does not exclude the capacity to earn interest from "earning capacity." It does not, for instance, limit that term to the capacity to earn wages. This establishes that the use of imputed rather than actual interest income does not conflict with the statute.

Brothers cites *In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353 [119 Cal.Rptr.2d 430] (*de Guigne*) and *In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 555 [251 Cal.Rptr. 370], to support his claim that "assets are an inappropriate basis upon which to calculate child support obligations and can only be considered as such under special circumstances." These cases do not undermine our conclusion. In *de Guigne*, the Court of Appeal considered

---

[1] Subsequent statutory references are to the Family Code.

a child support order based in part on the father's unliquidated assets, mainly his palatial home. It concluded that, because an order based on the father's actual income alone would result in a drastic reduction in the children's standard of living, the trial court's reliance on the nonincome-producing assets, including the house, was not an abuse of discretion. (*de Guigne, supra,* 97 Cal.App.4th at pp. 1358, 1360, 1362.) The court considered whether special circumstances supported the trial court's decision to exceed the guideline figure (*id.* at pp. 1361–1364 [they did]), but did not assert that special circumstances were required to justify reliance on a parent's potentially, but not actually, income-earning assets as opposed to his actual earnings.

Catalano might have been helpful to Brothers if it were still good law. In that case, the Court of Appeal rejected a noncustodial parent's argument that the support amount should be less than that awarded by the trial court because the custodial parent was earning somewhat less as a nurse than she could earn by working different shifts. The court stated that "a court will not base an award on earning capacity as opposed to actual earnings unless the parent appears to be avoiding his or her responsibilities *and* it would be in the child's best interests to impute the difference in earnings . . . ." (*In re Marriage of Catalano, supra,* 204 Cal.App.3d at p. 555.) This proposition has been rejected by more recent Court of Appeal decisions. Although "[s]ome early cases held that imputation of income may only occur where the court finds the parent in question was deliberately trying to avoid his or her child support obligations," "[t]his interpretation no longer prevails—recent decisions of the Courts of Appeal now recognize a finding of bad faith is no longer a prerequisite: 'As long as ability and opportunity to earn exists, . . . the court has the discretion to consider earning capacity when consistent with the child or children's best interests.' [Citations.]" (*In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1338, fn. 2 [66 Cal.Rptr.2d 393].)

We agree with the more recent approach. There is no statutory basis for limiting imputed income to cases of bad faith failure to earn. That limitation would conflict with the law's policy of making the child's best interests the leading consideration in child support cases. (See *de Guigne, supra,* 97 Cal.App.4th at pp. 1359–1360.)

Citing *In re Marriage of Pearlstein, supra,* 137 Cal.App.4th at page 1373, Brothers also argues that unrealized gains in the value of assets are not normally counted as income for purposes of calculating child support. This may be true, but it is not relevant to the facts of this case. Brothers did realize the gain in value on his house; he converted the gain to cash when he sold the house. Further, the court did not count the gain itself as income. It only counted the imputed interest on the gain. There is no rule against imputing interest income on the basis of a cash asset.

A question suggested but not clearly articulated in Brothers's brief is whether the court chose the wrong amount of assets on which to base the imputed-income calculation. Specifically, did the court make a mistake when it based the imputed interest amount on all the assets Brothers liquidated or could easily liquidate immediately after his arrest, instead of using only the amount that remained unspent, on deposit in the client trust account, at the time of the court's decision?

The answer is no. Three things happened after Brothers was arrested and taken to jail: He stopped making support payments, lost his ability to earn income by working, and transferred the proceeds of the sale of his assets to his lawyer. He made no provision for the support of his daughter, choosing instead to devote all his available resources to his defense. We believe the trial court had discretion to impute interest based on the assets Brothers had immediately before he took this course of action. The point of using imputed income to calculate child support is to determine what the obligor *could* have earned if he or she had taken an opportunity to do so instead of taking a course of action that did not result in income. That is all the trial court did in this case when it based the imputed-income calculation on the total amount of the funds rather than the amount that remained unearned by Little at the time of the ruling.

In sum, the court did not err when it based the support calculation on imputed interest on Brothers's assets.

### B.   *Departure from guideline*

The trial court made a substantial departure from the support figure based on the statutory guideline. It imposed an obligation of $600 per month instead of $171 per month. Brothers argues that this was improper.

The guideline figure derived by application of the formula set forth in section 4055 is presumed to be correct. (§ 4057, subd. (a).) This presumption may be rebutted by a showing "that application of the formula would be unjust or inappropriate in the particular case" in light of a set of enumerated factors. (§ 4057, subd. (b).) One of the enumerated factors is simply that "[a]pplication of the formula would be unjust or inappropriate due to special circumstances in the particular case." (§ 4057, subd. (b)(5).) The statute includes a list of special circumstances, but states that the list is nonexclusive. (*Ibid.*)

A determination that the presumption has been rebutted must be "consistent with the principles set forth in Section 4053 . . . ." (§ 4057, subd. (b).) The principles stated in section 4053 include: "A parent's first and principal

obligation is to support his or her minor children according to the parent's circumstances and station in life" (§ 4053, subd. (a)); "[b]oth parents are mutually responsible for the support of their children" (§ 4053, subd. (b)); "[e]ach parent should pay for the support of the children according to his or her ability" (§ 4053, subd. (d)); "[t]he guideline seeks to place the interests of children as the state's top priority" (§ 4053, subd. (e)); "[t]he guideline is intended to be presumptively correct in all cases, and only under special circumstances should child support orders fall *below* the child support mandated by the guideline formula" (§ 4053, subd. (k), italics added); and "[c]hild support orders must ensure that children actually receive fair, timely, and sufficient support reflecting the state's high standard of living and high costs of raising children compared to other states" (§ 4053, subd. (*l*)).

█ The court found special circumstances in this case. As we have mentioned, the court cited five considerations in its order as justification for departure from the guideline figure. Among other things, it found that the child's standard of living could not be sustained if the guideline figure were used, that Brothers would no longer be contributing support via visitation, and that Brothers's own standard of living would not be impacted because he was incarcerated. Contrary to Brothers's assertion that "[n]one of the exceptional circumstances identified under the law exist here," the court acted within its discretion and acted consistently with the principles set forth in section 4053 when it found the guideline presumption to be rebutted on the basis of the factors it recited.

Brothers also repeats his argument that "no discretionary authority exists for the court to require a parent to support his child to the extent of his ability from earnings available from his general or pre-existing assets." For the reasons we have already stated, the assets Brothers liquidated after his arrest were an appropriate basis for imputing interest income.

The question arises of whether the court was wrong to assume Brothers had no or almost no expenses because he was incarcerated. In its order, the court stated that Brothers "has no appreciable living expenses while incarcerated, and will suffer no detriment to his standard of living by settling support above Guideline." It is presumably correct that Brothers's "standard of living" while incarcerated would not be much affected by the child support order, but saying so begs the question of whether his attorney's fees were themselves an expense of which the court should have taken account. Arguably, his desire to mount a defense in his capital case using retained counsel would have justified a hardship deduction (§ 4059, subd. (g)) from the imputed income on which the support order was based.

We need not decide whether the cost of retaining criminal defense counsel can ever constitute a basis for a hardship deduction. There is no authority for

the view that it can, so the trial court cannot be faulted for omitting any reference to a hardship deduction. More importantly, the court did exercise its discretion in dealing with the question of how much money Brothers could keep to pay his lawyer. It stated: "The total sum of $17,399.95 ordered to be paid for child support, including arrears, current support and future child support 'security deposit,' when deducted from [Brothers's] available funds as previously determined, leaves sufficient available funds and assets to fully pay the Attorney Retainer and pre-arrest defense related expenses. Post-arrest, [Brothers] has been determined to be indigent and all cost of his defense, except Mr. Little's fees, are being paid by the County."

The court's order did allow Brothers to spend the bulk of the proceeds of his liquidation of assets on his defense. The order to turn over $17,399.95 out of $150,000 left Brothers with $132,600.05, or 88.5 percent of the total, to pay to Little. Although the court's support calculation was based on taking almost all the imputed income ($600 per month out of $625, or 96 percent), its effect was to leave almost all the assets. Since Brothers's plan was, necessarily, to pay his legal expenses with principal, not income, it makes sense to view the detriment to him in light of the principal the court's order left him to use for this purpose rather than in light of percentage of imputed income it took.

For all these reasons, we hold that the trial court did not abuse its discretion when it departed from the guideline figure.

## C. Security deposit

In ordering Brothers to post a security deposit covering the two-year period until his daughter would reach majority, the trial court relied on section 4012, which provides: "Upon a showing of good cause, the court may order a parent required to make a payment of child support to give reasonable security for the payment." Brothers's argument on this point is a single sentence reading as follows: "Finally, the superior court, without citing a single supporting authority, ordered the payment of a security amount of $17,399.95, which represented more than two years of accrued child support payments to [the daughter], although it acknowledged that there was no authority specifically permitting the ordering of a security deposit corresponding to more than one year's accrued child support."

Brothers's argument is unpersuasive and mischaracterizes the trial court's order. The court discussed two other provisions of the Family Code, sections 4560 and 4614, that provide for a security deposit for up to one year of support payments. Then it observed that "[s]ection 4012 does not have any

such limitations." It is inaccurate that the court acted "without citing a single supporting authority." The court cited section 4012 and needed no other authority.

The only questions under section 4012 are whether there was "a showing of good cause" and whether the security required was "reasonable." Here, the good cause shown was that Brothers planned and attempted to direct all his resources to his attorney, leaving none for child support. There is little doubt that all the cash remaining in the client trust account would have been consumed by Little's fees if the court had not demanded that a portion of it be held as security. Brothers had nothing but cash to post as security, so the requirement of security in the form of a cash deposit was reasonable. The requirement that the deposit cover the entire period until Brothers's daughter reached majority was also reasonable. Under the circumstances, it was practically certain that the funds would not have been available as they came due if the court had not taken this step. For these reasons, we conclude that the trial court acted within its discretion in requiring the security deposit.

## II.  Right to counsel

Brothers argues that the trial court's order violated his Sixth Amendment right to counsel by diminishing the amount of money he had available to pay the lawyer of his choice. This contention has no merit.

The relevant principles are straightforward. They have recently been reiterated by the United States Supreme Court. An element of the Sixth Amendment right to counsel is "the right of a defendant who does not require appointed counsel to choose who will represent him." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140 [165 L.Ed.2d 409, 126 S.Ct. 2557, 2561].) A defendant is not, of course, guaranteed the right to choose a lawyer he cannot afford to retain. A defendant has " 'the right to be represented by an otherwise qualified attorney *whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.*' " (*Ibid.*, italics added.)

Brothers could not afford to pay Little the entire amount of his liquid assets. He could afford the entire amount minus $17,399.95. This was because he was obligated to pay that amount of child support under a valid child support order. The fact that this third party claim reduced the amount Brothers could pay to counsel has no constitutional implications. There is no authority for the idea that the Sixth Amendment protects a criminal defendant's assets from seizure by those with valid claims upon them.

If Brothers's argument were correct, the bringing of criminal charges would have an effect similar to a stay in bankruptcy. Creditors would be

unable to enforce claims against a defendant if this would impact the defendant's ability to pay criminal defense counsel. There is no support for this notion. Brothers characterizes the trial court's action as "interference with [Brothers's] right to obtain counsel of his choice whom he could afford . . . ." The court here engaged in no more interference than it would have if it had enforced an ordinary creditor's claim against Brothers.

Although Brothers is compelled to acknowledge in his brief that the United States Constitution does not guarantee him "access to money that does not belong to him to retain counsel," he attempts to avoid the logical consequence of this by asserting that there were no claims on the $17,399.95 at the relevant time. Brothers argues that his "funds were not subject even to any civil obligation, much less a criminal forfeiture, at the time he used them to retain counsel." The trouble with this argument is that *at the time when he retained* Little, Brothers *did not* "use" all the funds to pay Little. The trial court found, and Brothers does not dispute on appeal, that, so long as funds were in the client trust account, they were still Brothers's funds. At the time when a civil obligation—the new child support order—arose, the funds necessary to satisfy it had not been spent and were still under Brothers's control. He had no right to spend them all on future services to be rendered by his attorney when a portion of them was owed to someone else.

■ Due to the fact that the money in the client trust account had not been earned, there was not even a competing debt that could lay claim to the $17,399.95. Further, even if Brothers *had* already incurred a contractual obligation to pay Little all the money, but had not yet paid it, the child support obligation would have had priority over the debt to Little. By statute, child support obligations have priority over creditors' claims and must be paid first. (§ 4011.)

Brothers also argues that "a civil obligation under the Family Code cannot possibly override [Brothers's] federal constitutional right to counsel of his choice." There is, as we have said, no constitutional right to pay for counsel with money that is subject to a valid prior claim by a third party. Contrary to Brothers's implication, there is no competition here between constitutional rights and Family Code obligations. The constitutional right at issue is the right to choose counsel a defendant can afford. This right is not burdened or infringed just because the defendant can afford less on account of other obligations validly imposed by law.

## *DISPOSITION*

The judgment is affirmed.

Cornell, J., and Dawson, J., concurred.